UNITED STATES OF AMERICA,

v.

BRIAN D. McCOY,

Defendant.

**Hon. Hugh B. Scott**

07CR152S

**Report
&
Recommendation**

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(C). The instant matter before the Court is defendant's omnibus motion (Docket No. 12[1]), including a motion to suppress physical evidence, statements, and eyewitness testimony (id., Def. Atty. Aff. ¶¶ 57-75). The Court addressed (Docket No. 45) defendant's other motions for discovery and related relief in a separate Order.

## BACKGROUND

Defendant was charged with one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2). Defendant, having been convicted of a felony in 2001, was found on or about June 30, 2007, in possession of a Colt AR-15 A2, .223 caliber semi-automatic rifle and fifty-nine rounds of ammunition (Docket No. 1, Indict.).

---

[1]In support of this motion, defendant submitted his attorney's affidavit, Docket No. 12, post-hearing memorandum, Docket No. 42, and reply memorandum to the Government's submission, Docket No. 44.
  In opposition, the Government submitted its Response, Docket No. 15, and post-hearing memorandum in opposition, Docket No. 43.

Defendant moved to suppress physical evidence, eyewitness and defendant's statements arising from defendant's arrest at his home at 75 Aldrich Street, Buffalo, New York (see Docket No. 12, Def. Atty. Aff. ¶¶ 57-75). Defendant was arrested, without an arrest warrant, and his apartment searched (without a search warrant) beyond areas within defendant's grabbable reach upon his arrest (id. ¶¶ 57-59), eventually finding and seizing the Colt rifle in an upstairs bedroom while defendant was handcuffed downstairs (id. ¶¶ 60, 64). Defendant first contends that there was no probable cause to arrest defendant or hence to search his premises (id. ¶¶ 61-63). Defendant denies that any exception permitting a warrantless search was present here (id. ¶¶ 65-66, 68-71), in particular that the weapon was not in plain view, the search was not incident to a lawful arrest, and defendant did not consent to the search (id.). Defendant was the sole owner of 75 Aldrich, hence only he had the authority to consent to its search (id. ¶ 72). Defendant sought a suppression hearing on this issue (id. ¶ 75), which was granted and held on November 21, 2008 (Docket Nos. 32 (minute entry), 36 (transcript)), and December 5, 2008 (Docket No. 33 (minute entry)), and was deemed closed on December 30, 2008 (text entry, Dec. 30, 2008). After some extensions of time (see Docket Nos. 38, 39, 40, 41), post-hearing submissions were received by March 31, 2009 (see Docket Nos. 42, 43), and the motion was deemed submitted on that date.

The Government argues that the Buffalo police officers were lawfully in the defendant's house and that exigent circumstances justified his temporary detention (Docket No. 15, Gov't Response at 13). The Government claims that defendant freely made his statements, including the one to his girlfriend, Heidi Wallace, that she should just tell the police officers where the rifle was (id. at 14, 3). Wallace then said that the weapon was upstairs, that she put it in the corner of

a bedroom under some clothes (id. at 3). This lead officers to search upstairs and eventually find the firearm.

*Suppression Hearing*

The Government produced three Buffalo Police Department officers (Franklin King, Jr., Raymond Krug, and Lt. James O'Donnell[2]) to testify at the suppression hearing; defendant did not call any witnesses (see generally Docket No. 36). According to the testimony at the suppression hearing, on June 30, 2007, at approximately 10:30 pm, Officer King was on routine patrol when he was called to respond to an assault occurring at 75 Aldrich (see Docket No. 43, Gov't Post-Hearing Memo. at 1; Docket No. 42, Def. Post-Hearing Memo. at 3; Docket No. 36, Tr. of Nov. 21, 2008, Suppression Hearing at 4-5, 20-21, 26, 81, 128). While en route, King received an updated dispatch stating that he was to see a female who was hit by her father with a gun (Docket No. 42, Def. Post-Hearing Memo. at 3).

When King arrived at 75 Aldrich other police cars were there. King went to the rear of the house and knocked on the door. A woman answered the door and King asked her "where is he," she responded that he was not there, that he ran out front and did not have a gun with him. That woman was later identified as Wallace. Wallace then left by that back door, but leaving it partially open. King heard sounds inside the house from that partially opened door and pushed his way inside. (Docket No. 42, Def. Post-Hearing Memo. at 3-4; Docket No. 36, Tr. at 5, 9.)

King saw defendant standing in the middle of the kitchen. King and a second officer apprehended defendant, took him outside, and handcuffed him on the rear porch. Defendant was

---

[2]At the time of this incident, O'Donnell was a detective. Hereinafter he will be referred to by his present rank.

searched and no weapon was found on him. (Docket No. 42, Def. Post-Hearing Memo. at 4.) King was concerned for his safety when he heard the noise and when he saw the six foot, three inch, two hundred ninety pound defendant standing there, King brought defendant out of the house for that same reason (Docket No. 36, Tr. at 9-11). King notes that defendant was not under arrest at this time (id. at 12)

Wallace was returned to the house and questioned by other officers while King was outside with defendant[3]. King testified that defendant had been sitting handcuffed for about one to two minutes (Docket No. 43, Gov't Post-Hearing Memo. at 7) when he yelled into the house to Wallace to "just tell them where it is, tell them where the gun is," claiming that defendant said that about three or four times (Docket No. 36, Tr. at 12-13; Docket No. 42, Def. Post-Hearing Memo. at 4). King stated that this was not said in answer to a question he posed and it appeared to him to be a spontaneous statement on defendant's part (Docket No. 36, Tr. at 13). Wallace answered that the firearm was upstairs, in a corner underneath some clothes (id.). King understood defendants's and Wallace's statements as consent to proceed upstairs to look for the firearm (id. at 17, 68. 75. 79, 114; Docket No. 43, Gov't Post-Hearing Memo. at 6). The Government notes that at no time did defendant or Wallace object to the police conducting this search or tell the officers to stop searching (Docket No. 43, Gov't Post-Hearing Memo. at 6).

King and three other officers then proceeded upstairs to search for the weapon (Docket No. 36, Tr. at 13-14). There, they found two bedrooms, one large master bedroom and a smaller bedroom (Docket No. 43, Gov't Post-Hearing Memo. at 6; Docket No. 36, Tr. at 14). The

---

[3]Defendant notes that Wallace also was handcuffed, Docket No. 42, Def. Post-Hearing Memo. at 4 n.3.

officers went into the two bedrooms and searched everywhere and could not find the firearm (Docket No. 36, Tr. at 14). This initial search took approximately five to six minutes (Docket No. 43 Gov't Post-Hearing Memo. at 7). They then called upon Wallace to come to the top landing of the stairs and point out where the firearm might be; she pointed to a bedroom (Docket No. 36, Tr. at 14-15); this process took about another one to two minutes (Docket No. 43, Gov't Post-Hearing Memo. at 8). The officers searched that room and could not find it there (Docket No. 36, Tr. at 15). King then returned to the smaller bedroom he started searching initially, he "happened to just lift up the mattress that was in the bedroom" and found there the loaded firearm with an ammunition clip next to it (id. at 15, 86). This second search took another four to five minutes and the total time for the search was about fifteen minutes (Docket No. 43, Gov't Post-Hearing Memo. at 8). Defendant then was placed under arrest (Docket No. 43, Gov't Post-Hearing Memo. at 7).

King conceded that Wallace merely stated that the weapon was upstairs and did not consent to a search there (Docket No. 36, Tr. at 15, 44; Docket No. 42, Def. Post-Hearing Memo. at 5, 8; see also id. at 9 (regarding Officer Krug testifying that Wallace never granted permission to go upstairs)).

Defendant notes that, in cross-examination, Officer King did not know the circumstances of the assault that caused him to be dispatched to 75 Aldrich and that no names were given in the dispatch (Docket No. 42, Def. Post-Hearing Memo. at 5; Docket No. 36, Tr. at 20-21). King apparently never questioned Wallace about the assault or ascertained whether she was the injured party (see Docket No. 42, Def. Post-Hearing Memo. at 6, 7).

5

Officer Raymond Krug also arrived at 75 Aldrich at approximately 10:30 on June 30, 2007, based upon the dispatch call of man with a gun (id. at 10). Krug came to the rear of the house as well and witnessed Officer King knock on the door and have the conversation with Wallace. Krug did not testify to hearing a noise coming from inside the house (id.). After defendant was apprehended and handcuffed, Krug remained with defendant outside, but Krug could not hear what was said inside (id.). Krug did hear defendant say inside to "go ahead show them where the gun is, show them where the gun is," or words to that effect (id.: Docket No. 36, Tr. at 85). Krug testified that there was no conversation among the officers about securing the house (Docket No. 42, Def. Post-Hearing Memo. at 11; Docket No. 36, Tr. at 92-93). Prior to the weapon being found, Krug testified that he was aware that no one was in the house and hence no officer safety issues at that point (Docket No. 42, Def. Post-Hearing Memo. at 12; Docket No. 36, Tr. at 115).

Officer Krug later advised defendant of his Miranda rights (Docket No. 42, Def. Post-Hearing Memo. at 10; Docket No. 43, Gov't Post-Hearing Memo. at 8; Docket No. 36, Tr. at 87, 89, 101-02) after the weapon was found (Docket No. 42, Def. Post-Hearing Memo. at 11 & n.9). Defendant, not responsive to Krug's questioning (yelling at the officers about his medication, see Docket No. 36, Tr. at 103, 106, 107; Docket No. 43, Gov't Post-Hearing Memo. at 8), said "she set me up. She's a drunken crack head. She stole six hundred dollars from me. She knew about the gun. She set me up. I didn't touch her. She threw herself on the ground and that is why she hit her head. That gun is not mine, that's my girlfriend's gun. It's totally legal" (Docket No. 36, Tr. at 88; Docket No. 42, Def. Post-Hearing Memo. at 10-11; Docket No. 43, Gov't Post-Hearing Memo. at 8-9).

Krug testified that the house could have been sealed while a warrant was sought but no search warrant was sought; in fact, in his experience a police officer has never applied for a search warrant (Docket No. 36, Tr. at 120-21; Docket No. 42, Def. Post-Hearing Memo. at 12).

Lt. James O'Donnell then testified (Docket No. 36, Tr. at 127). O'Donnell (then a detective in the Buffalo Police Department[4], id.) as one of the last officers at the scene was unclear what was going on (Docket No. 42, Def. Post-Hearing Memo. at 13). He saw a girl on the sidewalk, bleeding and taking to some firemen; O'Donnell testified that this girl turned out to be the victim, the defendant's daughter (Docket No. 36, Tr. at 128; Docket No. 43, Gov't Post-Hearing Memo. at 4). Prior to defendant being advised of his Miranda warnings, Lt. O'Donnell asked him where the gun was located; defendant nodded toward a pile of rubbish in the backyard and said "over there" (Docket No. 36, Tr. at 129; Docket No. 42, Def. Post-Hearing Memo. at 13; Docket No. 43, Gov't Post-Hearing Memo. at 4). Lt. O'Donnell and another lieutenant searched the rubbish to no avail (Docket No. 42, Def. Post-Hearing Memo. at 13; Docket No. 36, Tr. at 129-30).

Lt. O'Donnell returned to the porch and asked defendant again where the gun was; defendant stated that it was "up there, to the house, up in the house" and he said to a female in the house to "just show them where it is" (Docket No. 36, Tr. at 130; Docket No. 42, Def. Post-Hearing Memo. at 13). Wallace's questioning was audible to the officers on the back porch with defendant (Docket No. 43, Gov't Post-Hearing Memo. at 5). Lt. O'Donnell testified that there was at least a thirty second delay between his question and defendant yelling into the house to Wallace about showing the officers where the firearm was and that defendant was not paying any

---

[4] See also note 2, supra.

attention to O'Donnell and his questions at that moment (id. at 5-6; Docket No. 36, Tr. at 139-40). Defendant contends that Lt. O'Donnell was questioning defendant at this point when he told Wallace to show the officers where the firearm was (see Docket No. 42, Def. Post-Hearing Memo. at 13).

*Post-Hearing Submissions*

The Government argues that defendant and Wallace consent to the search of the house for the firearm. Defendant consented when he told Wallace to just tell the officers where in the house the firearm was. (Docket No. 43, Gov't Post-Hearing Memo. at 9, 10, 11.) The Government claims that this statement was not the product of defendant being interrogated, but defendant was responding to the police questioning of Wallace (id. at 11), while Wallace herself was not under interrogation.

Defendant contends that the officers illegally entered his house, that he was questioned without first being advised of his Miranda rights, when he made his statements to Wallace to show the police where she put the firearm. He denies that Wallace had authority to consent to the search of his premises. The officers, nevertheless, proceeded to search the second floor beyond the area where Wallace said the firearm should have been found. Although the premises were secured, no attempt was made to obtain a search warrant for a wide scope search of the premises. Finally, defendant objects that Officer King searched the second bedroom and lifted a mattress to reveal the rifle, hence that weapon was never in plain view. (Docket No. 42, Def. Post-Hearing Memo. at 25-26.)

Defendant denies that there were exigent circumstances to justify arresting defendant in his home (id. at 14-18), that the anonymous 911 call later dispatched to Officers King, Krug and

the others did not furnish sufficient probable cause for the entry of the house (id. at 15-17, citing United States v. Sikut, 488 F. Supp. 2d 291, 307 (W.D.N.Y. 2007) (Arcara, Ch.J.) (adopting Report & Recommendation of Foschio, Mag. J.); United State v. Fareed, No. 01CR19, 2001 WL 1432285 (W.D.N.Y. Nov. 6, 2001) (Elfvin, J.) (upholding Report & Recommendation of Scott, Mag. J.), id. at *3 (Report & Recommendation)).

In reply, defendant argues that the "public safety" exception to Miranda the Government urges in its response does not apply here as a matter of law or factually (Docket No. 44, Def. Reply Memo. at 3-4). Factually, defendant contends that no public safety concern existed once the officers entered the house and secured the two occupants of the house–defendant and Ms. Wallace–since the officers then did not believe that any one else was in the apartment during their subsequent search for the firearm (and not a search for other persons in the house) that presented a possible threat (id. at 4). Defendant argues that he was responding to Lieutenant O'Donnell's questions when he called to Wallace (id. at 5).

## DISCUSSION

I.  Suppression of Rifle, Ammunition, and Other Physical Evidence

As the Government concedes that this was a warrantless search (Docket No. 43, Gov't Post-Hearing Memo. at 9; Docket No. 15, Gov't Response at 13), the issue thus is whether defendant granted consent to search his house (as one of the exceptions for warrantless search).

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated," and searches and seizures are generally to occur upon warrants issued upon probable cause, U.S. Const. amend. IV; Arizona v. Evans, 514 U.S. 1, 10 (1995). A search warrant

generally is required prior to entry of a home unless an exception to this warrant requirement is present, Arizona v. Hicks, 480 U.S. 321, 326 (1987). (Docket No. 42, Def. Post-Hearing Memo. at 14.) Similarly, an arrest warrant is required unless an exception to a warrantless arrest exists, see, e.g., Mapp v. Ohio, 367 U.S. 643 (1961); United States v. Watson, 423 U.S. 411 (1976).

The Government argues that exceptions to these warrant requirements–defendant's voluntary consent (Docket No. 43, Gov't Post-Hearing Memo. at 9-10) and, to a lesser extent, the consent granted by Ms. Wallace (see id. at 12-13)–exist here to justify the warrantless search of defendant's home. Another ground the Government asserts to support this warrantless search is the exigent circumstances surrounding the police officers' attempts to find the firearm (id. at 12). The Government uses this exigency to rationalize defendant's statement to Wallace if that statement is deemed to be an answer to Lt. O'Donnell's questions (id.).

A.    Probable Cause to Enter

As a preliminary matter, it must be determined whether the police had probable cause to arrest defendant, and therefore enter the house and conduct a search incident to a lawful arrest (including searching a grabbable area around the arrested defendant, cf. Arizona v. Gant, No. 07-542, 2009 U.S. LEXIS 3120 (U.S., Apr. 21, 2009); Chimel v. California, 395 U.S. 752, 763 (1969)). Defendant argues that there was no probable cause to enter, that all the officers had was two radio calls (which were not produced at the suppression hearing and which defendant challenged the information contained therein) (Docket No. 42, Def. Post-Hearing Memo. at 14, 16). He contends that an anonymous 911 call alone is not sufficient probable cause to justify a warrantless entry into a house (id. at 15, citing Sikut, supra, 488 F. Supp. 2d 291, and at 17, citing Fareed, supra, 2001 WL 1432285), and the Government had the burden of establishing that

10

exigent circumstances existed to overcome the presumption that the warrantless entry was unreasonable (id. at 16; see Welch v. Wisconsin, 466 U.S. 740, 750 (1984)). He denies whether there was an urgent need for Officer King to enter defendant's house (id. at 16; see United States v. MacDonald, 916 F.2d 766, 769 (2d Cir. 1990) (in banc)).

The Government does not address the probable cause for arresting defendant and for entering his house to do so. The Government merely argues exigency from the search of the firearm (see Docket No. 43, Gov't Post-Hearing Memo. at 12), implicitly providing probable cause to enter and arrest.

The United States Court of Appeals for the Second Circuit in MacDonald found that exigent circumstances requires that "law enforcement agents were confronted by an 'urgent need' to render aid or take action," 916 F.2d at 769, and adopting factors from Dorman v. United States, 435 F.2d 385, 392-93 (D.C. Cir. 1970) (in banc) as "illustrative sampling of the kind of facts to be taken into account, MacDonald, supra, 916 F2d at 770. These factors include the gravity of the offense with which the suspect is to be charged, whether the suspect is reasonably believed to be armed, a clear showing of probable cause to believe that the suspect committed the crime, a strong reason to believe that the suspect is in the premises, a likelihood of escape if defendant is not swiftly apprehended, and the peaceful circumstances of the entry, id. at 769-70; see Dorman, supra, 435 F.2d at 392-93.

Applying these illustrative factors here, defendant was suspected of having a weapon and using it in assaulting his daughter. He was believed to be at 75 Aldrich. It is unknown whether defendant was likely to escape, since he was apprehended in his kitchen and made no attempt to

escape or resist. Officer King entered the kitchen through a half-opened door with defendant standing waiting for him. The 911 dispatches, however, were not produced.

From the totality of the circumstances presented in this record, exigent circumstances existed for the officers' entry into 75 Aldrich and defendant's subsequent detention in handcuffs as the scene was secured. But once defendant was secured by being handcuffed on the porch (then the sole occupant of the house) and later Wallace being brought in and also secured, the "'urgent need' to take action" ceased. The police then needed a basis for conducting a search of areas of the house not occupied by defendant where it is clear from the record that the officers were not searching for other persons that may pose a threat to their safety or the public's safety, cf. Maryland v. Buie, 494 U.S. 325, 334 (1990) (upholding protective sweep of areas in house where officer reasonably suspects that a dangerous person may be hiding); Gant, supra, 2009 U.S. LEXIS 3120, at *26-27.

The Court next turns to grounds[5] to justify continuation of the warrantless search.

B.  Consent to Search

The ostensible basis for this warrantless search was defendant's consent from defendant's statement to Wallace that she just show the officers where the gun was (or perceived consent of

---

[5]Defendant denies that other grounds for warrantless search–including plain view or search incident to a lawful arrest or within the reach of the arrested subject–are applicable here, Docket No. 12, Def. Atty. Aff. ¶¶ 65-66, 68-71, 57-59. The record here supports defendant's conclusions that plain view and search incident to a lawful arrest are not applicable here, see also Gant, supra, 2009 U.S. LEXIS 3120, at *21, *22 (defendant, handcuffed in patrol car, was not within reaching distance of his car to justify subsequent search, despite diminished privacy interest of motorist as opposed to home owner).

Wallace from her later indicating that the weapon was in an upstairs bedroom[6]). The Fifth Amendment self-incrimination aspects of defendant's statement will be considered below. Here, the question is whether this scenario constitutes voluntary consent to waive defendant's Fourth Amendment rights. The voluntariness of consent is determined based upon the totality of circumstances, considering whether the consent was the product of free choice "rather than a mere acquiescence in a show of authority," United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993) (id. at 10). The Government has the burden of establishing that consent was in fact voluntarily given and not the result of duress or coercion "express or implied," Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973); United States v. Arango-Correa, 851 F.2d 54, 57 (2d Cir. 1988).

The Fourth Amendment is not violated if the authorities obtain the voluntary consent of the person authorized to grant it, see United States v. Elliott, 50 F.3d 180, 185 (2d Cir. 1995). The fact that the defendant is in custody by itself does not render his consent involuntary, see Arango-Correa, supra, 851 F.2d at 57; see also United States v. Kon Yu-Leung, 910 F.2d 33, 41 (2d Cir. 1990) (Docket No. 43, Gov't Post-Hearing Memo. at 9). In Kon Yu-Leung, the Second Circuit remanded on the question of whether the totality of the circumstances there indicated that

---

[6]While cited by the Government, it is not expressly arguing that Wallace had apparent authority to authorize the police to search. There was no evidence introduced as to Wallace's possessory interest or relationship with 75 Aldrich. While there was testimony that she was defendant's girlfriend and, from his request to her to just tell the officers where the gun was, presumably knowledgeable of the whereabout of items in the house, there was no evidence adduced that showed that a reasonable officer could conclude that she was had the authority to allow a search.
  Even if Wallace (by her actions) indicated her consent to the search of the upstairs of defendant's house, she had no authority to issue that consent. Officer King testified that he did not seek Wallace's consent (Docket No. 36, Tr. at 75-76).

13

defendant voluntarily consented to a search or not, 910 F.2d at 41, while the court in Arango-Correa upheld the finding that the defendant voluntarily consented to the search despite a five-hour detention, 851 F.2d at 57-58.

Despite the Government's contrary assertion (cf. id. at 9-10), the record here shows that only the defendant was the owner-occupant of 75 Aldrich, hence only he had the authority to consent to its search. There was no testimony establishing Ms. Wallace's occupancy of 75 Aldrich, despite her purported knowledge of items within that house. Here, defendant was handcuffed but detained for minutes while he made his statement to Wallace and during the subsequent search. The officers repeatedly asked him the same question, where was the gun, within that brief period, but this questioning was not enough to overwhelm him so as to render his subsequent statement coerced, cf. Arango-Correa, supra, 851 F.2d at 57.

Thus, under the Fourth Amendment, defendant's statement was voluntary and not coerced. Outside of a custodial interrogation setting, defendant's statement would be considered consent to search and any materials found would not be subject to suppression. But defendant rendered this statement without first being advised of his rights. The Court turns next to the custodial nature of this statement.

II.     Defendant's Statement

Connected with suppression of defendant's rifle and ammunition is defendant's statement purporting to grant consent to the search to locate it, namely his initial statements to Wallace and then his subsequent denials. Even if these statements constitute consent to search, they still may be infirmed under defendant's Fifth Amendment rights, particularly against self-incrimination.

14

A.     Pre-Miranda Warning Statement

The key statement of defendant to Wallace occurred before he was arrested formally and advised of his Miranda rights. Defendant contends that factually he was in custody and was being interrogated when he told Wallace to disclose the location of the firearm to the police (Docket No. 42, Def. Post-Hearing Memo. at 18-20; see Docket No. 44, Def. Reply Memo. at 5-6). Lieutenant O'Donnell repeatedly asked defendant where he had the gun before (after a pause of about thirty seconds, see Docket No. 36, Tr. at 139-40; Docket No. 43, Gov't Post-Hearing Memo. at 5) defendant called to Wallace and told her to just show the officers where it was.

While defendant's statement to Wallace appears not to relate to O'Donnell's questioning, it was responsive to it (and to the apparent questioning Wallace was facing inside the house). Defendant clearly was in custody or what a reasonable person would conclude was custody; he was in handcuffs and not free to leave while police questioned him.

The finding of the public safety exception to Miranda from United States v. Newton, 369 F.3d 659, 677 (2d Cir. 2004), is distinguishable from the record here. In Newton, the court found that three persons in the apartment could have used the firearm there and (given the hostilities among them) a public safety issue to them, the officers, and the general public arose, despite the fact that the suspect there was handcuffed when questioned about the location of the firearm, id. at 678, while that defendant was brought into the apartment that was searched for the weapon, id. at 663-64.

In the present case, however, while it was initially unknown how many other persons were in defendant's house, the police had secured both defendant and Wallace, the two known occupants in that property, when asking defendant where the firearm was. Defendant was placed

outside of the house, away from where the weapon was found. The officers' subsequent search did not locate others. This does not present the public danger presented in New York v. Quarles, 467 U.S. 649, 657 (1984), relied upon by the Second Circuit in Newton, see 369 F.3d at 678, where the weapon in Quarles was left in a supermarket where defendant's accomplices, store personnel or anyone in the public could have found it. The firearm in this case was found under a mattress in a bedroom where the two occupants of the house were secured by the police.

Defendant's statements prior to being advised of his rights should be **suppressed**.

B.  Fruit of Poisoned Tree

The suppressed statement forms the basis for the consent the Government uses to justify the search and eventual discovery of the firearm. Defendant argues that, due to the illegality of the police entry into his house, his subsequent consent "if given at all is vitiated by the initial illegality," (Docket No. 42, Def. Post-Hearing Memo. at 17, citing United States v. Ceballos, 812 F.2d 42 (2d Cir. 1987); see id. at 49-50 (where consent to search was given within minutes of the illegal arrest, court held that consent was too close in time to illegal arrest to break chain of illegality and evidence obtained by that consent should be suppressed)). While the Court disagrees with the conclusion that the initial entry was illegal, defendant points to the taint arising from illegality in the search or obtaining defendant's statements that poison the fruit of those endeavors.

"Generally, tangible and testimonial evidence directly or indirectly derived from unconstitutional police conduct must be suppressed because it is tainted or constitutes 'fruit of the poisonous tree.' See Murray v. United States, 487 U.S. 533, 536-37 (1988); Wong Sun v. United States, 371 U.S. 471, 484 (1963); Nardone v. United States, 308 U.S. 338, 341 (1939) . .

.," United States v. O'Brien, 498 F. Supp. 2d 520, 539 (N.D.N.Y. 2007), aff'd mem., 303 Fed. Appx. 948, 2008 U.S. App. LEXIS 25925 (2d Cir. Dec. 22, 2008). The doctrine applies to coerced confessions that taint subsequent searches or Fourth Amendment violations that taint statement, O'Brien, supra, 498 F. Supp. 2d at 539. "The critical issue is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Wong Sun, 371 U.S. at 488 (internal quotation marks and citations omitted)." O'Brien, supra, 498 F. Supp. 2d at 540. In determining whether the taint is sufficiently separated from the evidence sought to be introduced, courts consider "whether a Miranda warning was given; the temporal proximity of the detention and any statements; the presence of intervening circumstances; and the purpose and flagrancy of the illegal arrest," United States v. Restrepro, 890 F. Supp. 180, 198 (E.D.N.Y. 1995) (Weinstein, J.). In Restrepro, Judge Weinstein suppressed seized cocaine and statements as the fruit of an illegal stop, detention, and search, id. at 199; see also id. at 192-99 (describing other Fourth Amendment violations leading to poisoned fruit).

While consent to search may provide an independent justification for an otherwise tainted seizure, see O'Brien, supra, 498 F. Supp. 2d at 540-41, the taint here is the consent the Government relies upon. Defendant was in custody, see United States v. Newton, 369 F.3d 659, 677 (2d Cir. 2004) (reasonable person held to understood that he was in fact in custody, or at least not free to leave, while he was being questioned) (see also Docket No. 42, Def. Post-

17

Hearing Memo. at 18-19; Docket No. 44, Def. Reply Memo. at 3[7]), and was being questioned about the location of the firearm but was not advised of his rights when he made the statement that the Government construes as his consent to search. As fruit of the poisoned tree, the physical evidence seized as a result of defendant's suppressed consent statement also **should be suppressed**.

        C.        Post-<u>Miranda</u> Statement

After being advised of his rights by Officer Krug, defendant made his denial of possessing the firearm, blaming Wallace for set him up and possibly suggesting that she possessed the weapon. These statements were spontaneous and voluntary and **should not be suppressed**. Defendant's motion to suppress these statements **should be denied**.

## CONCLUSION

Based upon the above, it is recommended that defendant's omnibus motion (Docket No. 12) to suppress physical evidence, statements, and eyewitness testimony be **granted in part, denied in part** as described in the Order. In particular, the physical evidence **should be suppressed** as fruit of the poisoned tree as well as **defendant's initial statements prior to being advised of his <u>Miranda</u> rights**, but defendant's statements <u>after</u> being advised of his rights **should not be suppressed**.

---

[7]The parties dispute the applicability of the public safety exception discussed in <u>Newton</u>, <u>supra</u>, 369 F.3d at 677, <u>compare</u> Docket No. 43, Gov't Post-Hearing Memo. at 19 <u>with</u> Docket No. 44, Def. Reply Memo. at 3-4.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) and W.D.N.Y. Local Civil Rule 72.3(a).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME OR TO REQUEST AN EXTENSION OF SUCH TIME WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT DISTRICT COURT'S ORDER ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The District Court on de novo review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.**

SO ORDERED.

/s/ Hugh B. Scott
Hon. Hugh B. Scott
United States Magistrate Judge

Dated: Buffalo, New York
April 29, 2009